## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **Case No. 24-cr-098 (TNM)** |
| **v.** | **:** | |
| | **:** | |
| **SHAWN MAHONEY,** | **:** | |
| | **:** | |
| **Defendant** | **:** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  The defendant, Shawn Mahoney, pled guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D), disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol (Count Three), and a violation of 40 U.S.C. § 5104(e)(2)(G), parading, demonstrating, or picketing in any Capitol building (Count Four).  For the reasons set forth herein, the government requests that this Court sentence Mahoney to 30 days of incarceration on Count Three and 36 months of probation on Count Four.  The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

### I.     Introduction

Defendant Shawn Mahoney, a thirty-four-year-old forklift operator from Bristol, N.H., participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the

1

peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Mahoney pled guilty to violations of 40 U.S.C. §§ 5104(e)(2)(D) and (G). The government's recommendation is supported by: (1) Mahoney being one of the first rioters to reach the Upper West Terrace; (2) the length of time Mahoney spent in the Capitol building; (3) Mahoney's proximity to rioters who assaulted and pushed through the police line in the Capitol Crypt; (4) Mahoney's refusal in an interview with FBI Agents to discuss an individual who was with him on January 6; and (5) his significant criminal history.

The Court must also consider that Mahoney's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Mahoney's crime support a sentence of 30 days of incarceration in this case.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers the Court to the general summary of the attack on the U.S. Capitol. *See* ECF No. 23 (Statement of Offense).

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

*Defendant Mahoney's Role in the January 6, 2021, Attack on the Capitol*

On January 5, 2021, Mahoney and another individual, Subject 1, drove from Bristol, N.H. to Washington, D.C. to attend former President Trump's Stop the Steal Rally, which was planned for the next day.  After spending the night of January 5 at a hotel in Virginia, on the morning of the 6th, the pair took the train to Washington, D.C. and attended the rally, where they heard the former President speak.



*Image 1:  Screenshot from open-source video taken on January 6 showing Mahoney (circled in yellow) attending the Stop the Steal Rally.*

During the former President's speech, Mahoney recorded a video of himself in which he stated that he and other rioters were going to walk to the Capitol, and that "we're in for wild ride, big surprises coming, big surprises."[2]  Mahoney admitted in a later FBI interview that he knew

---

[2] Mahoney's phone was searched following his arrest and no relevant materials were discovered.

that Congress was meeting at the Capitol on January 6th to certify the Electoral College vote and that the Vice President was presiding over the Joint Session.



*Image 2:  Screenshot of January 6 self-recorded video taken by Mahoney discussing his plan to go to the Capitol.*

After recording his selfie-video, Mahoney and Subject 1 walked east until they reached the Capitol.  The pair then entered the restricted perimeter on the West Front and moved toward the temporary scaffolding erected to the North of the Inaugural Stage.  Once there, Mahoney and Subject 1 walked up the Northwest Stairs toward the Upper West Terrace, moving along a stone ledge at the edge of the Stairs and using the scaffolding to assist their balance.



*Image 3: Screenshot from open-source video taken on January 6 showing Mahoney (circled in yellow) walking up a ledge on the Northwest Stairs toward the Upper West Terrace.*

As Mahoney and Subject 1 climbed toward the Upper West Terrace, a small group of U.S. Capitol Police Officers attempted to block rioters from advancing further up the Northwest Stairs. At approximately 2:09 p.m., rioters rushed the officers, pushing them out of their way and moving further up the Stairs. Mahoney and Subject 1 followed these rioters toward the top of the Northwest Stairs.



*Image 4: Screenshot from January 6 U.S. Capitol CCTV footage showing Mahoney (circled in yellow) moving up the Northwest Stairs after the police line on the Northwest Stairs was broken.*

At the top of the Northwest stairs, another small group of officers formed the last line of defense between the oncoming mob and the Capitol building.  But rioters soon overwhelmed these officers as well and flooded onto the Upper West Terrace.  Mahoney and Subject 1 reached the Upper West Terrace only 30 seconds after the first rioters, and once there, Mahoney turned to his left, moved toward the edge of the Upper West Terrace overlooking the crowd below, and while staring at the crowd, shouted and raised his arms in celebration.



*Image 5:  Screenshot from open-source video taken on January 6 showing Mahoney (circled in yellow) raising his arms in celebration toward the crowd below.*

After spending a few minutes on the Upper West Terrace, Mahoney and Subject 1 moved to the Senate Wing Door, and at 2:16 p.m., less than five minutes after the Door was first broken into, entered the Capitol Building.  The pair did so despite hearing a blaring alarm sounding as they walked in.



*Image 6: Screenshot from January 6 U.S. Capitol CCTV footage showing Mahoney (circled in yellow) entering the Capitol building through the Senate Wing Door.*

Once inside the Capitol building, Mahoney briefly stopped to capture the scene on his cellphone, then turned to his left and walked north along the Brumidi Corridor with Subject 1 until they ran into two U.S. Capitol Police officers standing near the North Door to the Capitol. Mahoney and Subject 1 then turned around and walked back south, past the Senate Wing Door, and toward the Capitol Crypt.



*Image 7: Screenshot from January 6 U.S. Capitol CCTV footage showing Mahoney (circled in yellow) in the Brumidi Corridor.*

Mahoney and Subject 1 entered the Capitol Crypt at approximately 2:19 p.m. As they entered, a handful of U.S. Capitol Police officers were holding a line in the middle of the Crypt, trying to stop rioters from moving further south into the Capitol toward the House side. Mahoney—with his cell phone out and appearing to record the scene around him—and Subject 1 waded into the mob, who were yelling and chanting phrases such as "Our House" at the officers.



*Image 8: Screenshot from January 6 U.S. Capitol CCTV footage showing Mahoney (circled in yellow) in the Capitol Crypt.*



*Image 9: Screenshot from open-source video taken on January 6 showing Mahoney (circled in yellow) appearing to take video on a cell phone in the Capitol Crypt.*

Moving forward through the crowd toward the line of officers, Mahoney joined in the mob's disorderly conduct, yelling and chanting along with his fellow rioters.



*Image 10: Screenshot from open-source video taken on January 6 showing Mahoney (circled in yellow) moving to the front of the mob of rioters in the Capitol Crypt.*

At approximately 2:25 p.m., rioters broke through the police line and pushed south to the House side of the Capitol.  Mahoney and Subject 1 joined, rushing past the outnumbered Officers.



*Image 11: Screenshot from open-source video taken on January 6 showing Mahoney (circled in yellow) and the mob in the Crypt pushing past the fallen police line.  Note the U.S. Capitol Police officer (circled in red) in the middle of the mob.*

As Mahoney and Subject 1 moved south through the Crypt and down a hallway leading into the House side of the Capitol, Mahoney took a baseball hat, and flung it behind him into the crowd.



*Image 12: Screenshot from open-source video taken on January 6 showing Mahoney (circled in yellow) throwing a hat (circled in red) behind him.*

As the mob moved from the Crypt, rioters began breaking into Congressional Offices, including that of the House Majority Leader. Mahoney entered House Room H112M, which is a restroom one door down from the House Majority Leader's Office, without authorization.



*Image 13: Screenshot from open-source video taken on January 6 showing Mahoney exiting room H112M.*

After Mahoney left Room H112M at approximately 2:33 p.m., another rioter handed him a cupcake, which Mahoney knew had been stolen from a Congressional Office.  Mahoney took a bite and then placed the half-eaten cupcake on a bust of Winston Churchill.



*Image 14:  Screenshot from January 6 U.S. Capitol CCTV footage showing Mahoney (circled in yellow) leaving a half-eaten cupcake (circled in red) on a bust of Winston Churchill.*

At approximately 2:34 p.m., Mahoney walked back north through the Crypt, and after taking a photo at 2:35 p.m., continued to the Senate Wing Door, where he had first entered the Capitol.  Mahoney departed the Capitol Building approximately 22 minutes after he entered, at 2:38 p.m., by climbing out through a broken window adjacent to the Senate Wing Door.

*Mahoney's Post-Plea Interview*

On October 1, 2024, Mahoney spoke with FBI Agents regarding his conduct on January 6, as required by his plea agreement.  While Mahoney fully admitted to entering the Capitol Building and his conduct described above, Mahoney refused to answer questions regarding Subject 1.  In addition to not cooperating regarding Subject 1, Mahoney claimed that police officers allowed rioters to enter the Capitol grounds.  He also complained that officers had used an inappropriate amount of force responding to rioters, dispersing "smoke grenades" and other crowd control measures which Mahoney alleged injured rioters and riled the crowd up.  These statements are

demonstrably false.  Moreover, Mahoney stated that he never saw rioters assault any officers, which is inexplicable since he was so close to rioters who pushed past the line of officers in the Crypt and said he witnessed the breach at the top of the Northwest Stairs.

<em>The Charges and Plea Agreement</em>

On February 23, 2024, the United States charged Mahoney by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On June 27, 2024, pursuant to a plea agreement, Mahoney pled guilty to Counts Three and Four of the Information, charging him with a violation of 40 U.S.C. §§ 5104(e)(2)(D) and (G).  By plea agreement, Mahoney agreed to pay $500 in restitution to the Architect of the Capitol.

## III.  Statutory Penalties

Mahoney now faces a sentencing for violating 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000 for each count.  Mahoney must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As these offenses are Class B Misdemeanors, the Sentencing Guidelines do not apply to them.  18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

## IV.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  As described below, the Section 3553(a) factors weigh in favor of 30 days of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds

12

of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).  While assessing Mahoney's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.  Notably, for a misdemeanor defendant like Mahoney, the absence of violent or destructive acts is not a mitigating factor.  Had Mahoney engaged in such conduct, he would have faced additional criminal charges.

The most important factors in Mahoney's case include that he: was one of the first rioters to reach the Upper West Terrace; spent 22 minutes inside of in the Capitol building; was extremely close to other rioters who assaulted and pushed through the police line in the Capitol Crypt; entered a closed House room; refused to identify Subject 1 to FBI Agents; downplayed the violence of rioters on January 6; and has a significant criminal history.  Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Mahoney's History and Characteristics

As set forth in the PSR, Mahoney's criminal history is extensive.[3]  His adult convictions include:

1. August 10, 2009 – convicted of Burglary, Resisting Arrest, and Unlawful Possession of Alcohol by a Minor (the defendant was 18 at the time);

2.  August 10, 2009 – convicted of Sexual Assault;

3. May 2, 2009 – convicted of Larceny;

---

[3] Because the Sentencing Guidelines do not apply to Mahoney's Counts of Conviction, the PSR did not calculate a Criminal History Score.

4. January 12, 2017 – convicted of DUI of the 2nd or 3rd degree, Resisting Arrest/Detention, and having an Open Container; and

5. July 13, 2017 – convicted of Resisting Arrest and Criminal Mischief.

PSR ¶¶ 30-34.  In addition, Mahoney was arrested for Disorderly Conduct on February 25, 2021, and Driving After Suspension on May 6, 2022, though these cases were placed on file without a finding based on six months of good conduct.  PSR ¶¶ 40-41.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol Building and Grounds was an attack on the rule of law.  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, June 9, 2023 Tr. at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building.  What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration over only sentencing him to probation.

While Mahoney's actions on January 6 are bad enough in isolation, Mahoney's criminal history reveals a pattern of disrespect for the law.  *See* Section IV(B) *supra*.  Moreover, as recently as October 1, 2024—mere weeks before his sentencing in this case—during his interview with FBI agents, Mahoney minimized the actions of rioters on January 6, repeated lies that police had allowed rioters to come on into the Capitol grounds and were fine with them exiting the Capitol Building through a broken window, and that it was the police who were unjustly violent on January 6, not the rioters.  The fact that nearly three years later, after he has had plenty of time to reflect on his crimes, that Mahoney cannot fully acknowledge what happened that day is shocking.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[4]  This Court must sentence Mahoney based on his own

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.  As in all federal criminal cases, the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply here.

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Tippett*, 23-cr-37 (CRC), the defendant pled guilty to violating 40 U.S.C. §§ 5104(E)(2)(D) and (G).  Tippett, like Mahoney, entered the restricted perimeter on the West Front and moved toward the Northwest Stairs.  Tippett was then in the same group of rioters as Mahoney who rushed up the Northwest Stairs immediately after the officers defending that position were pushed out of the way, and Tippett entered the Senate Wing door at approximately the same time as Mahoney.  Whereas Mahoney went to the Crypt, Tippett went down a hallway to the House side of the Capitol, then moved to the Upper Entrance to the Capitol Visitors Center. At the Visitors Center, Tippett tried to keep metal gates from sealing off the hallway by moving metal chairs under them, and after doing this remained in the Visitors Center for approximately 15 minutes.  Tippett then went back through the Crypt to the Senate Wing door and exited the Capitol

BREACH CASES."  The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

building, much like Mahoney.  After exiting the building Tippett, remained on the Upper West Terrace for an hour, until a fellow rioter he was with was hit by OC spray from officers.

Like Mahoney, Tippett had a criminal history with multiple prior convictions. Although Tippett also minimized his and the mob's conduct in a post-arrest interview with the FBI, he did not refuse to answer questions regarding other rioters he was with on January 6.  Mahoney, though, refused to answer any questions regarding Subject 1.  Tippett also did not enter a room in the Capitol without authorization, as Mahoney did.  Judge Cooper sentenced Tippett to 30 days' incarceration.

In *United States v. Adkins*, 23-cr-273 (TNM), the defendant pled guilty to violating 40 U.S.C. §§ 5104(E)(2)(D) and (G).  Like Mahoney, Adkins moved through the West Front to the Northwest Stairs, went up the Northwest Stairs at approximately the same time as Mahoney, and entered the Senate Wing door a little over a minute before Mahoney.  Inside of the Capitol Building, Adkins helped another rioter climb through a window next to the Senate Wing Door, then went to the Crypt and to the Capitol Visitors Center, carrying an open beer with him.  After officers ejected rioters from the Visitors Center, Adkins moved back to the Crypt, and eventually left the Capitol building through the Memorial door after having spent an hour and 18 minutes inside.  Like Mahoney, Adkins minimized his conduct on January 6, though in an early pre-arrest interview with the FBI, not years later.  This Court sentenced Adkins to 12 days of intermittent confinement.

While Adkins spent a longer period of time inside of the Capitol building, Mahoney's criminal history is more serious than Adkins's.  Adkins also presented a significant mitigating circumstance that Mahoney does not: he suffers from PTSD arising from his prior military service.

Thus in the absence of any mitigating circumstances, and with a more serious criminal history, Mahoney is deserving of a harsher sentence.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5]  Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss."  18 U.S.C.  § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).  At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3).  *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.  The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Mahoney must pay $500 in restitution, which reflects in part the role Mahoney played in the riot on January 6.[6]  Plea Agreement at ¶ 11.  As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.*  (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.)  Mahoney's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.  PSR ¶ 9.

## VI.    Fine

Mahoney's convictions for violations of 40 U.S.C. §§ 5104(e)(2)(D) and (G) subject him to a statutory maximum fine of $5,000 for Count Three and $5,000 for Count Four. *See* 18 U.S.C. § 3571(b).  In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.  *See* 18 U.S.C.  § 3572(a)(1); U.S.S.G. § 5E1.2(d).  The sentencing guidelines require a fine in all cases, except where the

---

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023).  Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.  PSR ¶¶ 74-85.

**VII.    Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 30 days of incarceration on Count Three and 36 months of probation on Count Four.  The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Mahoney's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.


Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052



DATED: October 16, 2024            By:   */s/ Matthew E. Vigeant*
                                         MATTHEW E. VIGEANT
                                         Assistant United States Attorney
                                         D.C. Bar No. 144722
                                         U.S. Attorney's Office for the District of Columbia
                                         601 D Street, N.W.,
                                         Washington, D.C. 20530
                                         (202) 252-2423
                                         Matthew.Vigeant@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 16th day of October 2024, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

*/s/ Matthew E. Vigeant*
MATTHEW E. VIGEANT
Assistant United States Attorney
D.C. Bar No. 144722
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.,
Washington, D.C. 20530
Phone: (202) 252-2423
Email: Matthew.Vigeant@usdoj.gov
